# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3013-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARCO R. GAINES,

    Defendant-Appellant.

_____

Argued March 17, 2021 – Decided July 16, 2021

Before Judges Accurso and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FO-11-0207-19.

John McGahren argued the cause for appellant (Morgan, Lewis & Bockius, LLP, attorneys; John McGahren and Sean Radomski, on the briefs).

Ryan William Sundstrom, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Ryan William Sundstrom, of counsel and on the brief).

PER CURIAM

Defendant Marco R. Gaines appeals from an April 7, 2020 conviction for the disorderly persons offense of contempt, N.J.S.A. 2C:29-9(b)(2), stemming from a violation of a February 5, 2019 temporary restraining order (TRO) obtained by his ex-girlfriend, A.G.-B., with whom he shares a son, Ryan[1]. We affirm.

Defendant was tried in absentia, after receiving his Hudson[2] warnings. The State called three witnesses, namely A.G.-B., Sheriff's Officer Robert Kelly, and Officer Aaron Camacho. A.G.-B. testified she ended the parties' two-year dating relationship in January 2019 because defendant "was too abusive, mentally and physically." She stated that after she ended the relationship, defendant "wouldn't leave [her] alone," so she obtained a TRO in February 2019. The TRO expressly prohibited defendant from going to her residence and having "any oral, written, personal, electronic, or other form of contact of communication" with her. Additionally, the TRO granted A.G.-B. temporary

---

[1]  We use initials and pseudonyms to protect the privacy and interests of the victims.  R. 1:38-3(c)(12).

[2]  State v. Hudson, 119 N.J. 165 (1990) (holding that a defendant may waive his presence at trial by either a written or oral waiver, or by conduct evidencing what is, in effect, such a waiver).

A-3013-19

custody of Ryan, and specifically barred defendant from having any form of contact or exercising any parenting time with the parties' son.

A.G.-B. testified that on April 19, 2019, defendant showed up unexpectedly at her home at approximately 1:00 a.m., demanding to see Ryan. When she refused his request and told him to leave, he kicked in her door, breaking her dead bolt. A.G.-B. testified defendant "just kept saying . . . I want to see my son." Further, A.G.-B. testified that although she advised defendant Ryan was sleeping, defendant "just kept yelling and . . . clenching his fists and trying to hit [her]" as she repeatedly told him he could not see their son. She then let defendant wake up and play with Ryan "because [she] was terrified that he would hit [her]" if she did not acquiesce to his demands.

After approximately thirty to sixty minutes, A.G.-B. told defendant it was too late for their son to be up and she instructed defendant to leave. Defendant resisted her request, briefly argued with her, and then left. A.G.-B. testified that as defendant departed, he threw objects from his car at her. She called the police as defendant was leaving, but he was no longer on the premises by the time officers arrived. A.G.-B. confirmed she did not call the police while defendant was in her home because she feared he would "break [her] phone and try to beat [her] up."

3

During A.G.-B.'s cross-examination at trial, defendant's attorney first asked her to state her name and spell it. A.G.-B. complied and explained her full name was "supposed to be hyphenated." In response to further questioning from the defense, she admitted her full name was "different than the name identified on the [restraining] order," but stated that when she applied for a restraining order, she had provided her hyphenated name.

When Officer Kelly testified, he confirmed he served defendant with the TRO on February 7, 2019. Officer Camacho testified that when he responded to A.G.-B.'s home on April 19, 2019, she was "very distraught" and complained defendant came to her residence "demanding to see his child." Officer Camacho stated A.G.-B. told him defendant "kick[ed her] door in, breaking the lock and the dead bolt, and proceeded inside the house." Officer Camacho recalled that while he was at A.G.-B.'s home, her door could not be shut or locked, even though he personally tried to lock her door, and A.G.-B. "had to push a sofa in front of the door because it could not shut." The officer also identified pictures he took of her damaged door.

During Officer Camacho's cross-examination, defense counsel asked if the officer arrived at A.G.-B.'s home at 6:15 p.m. on the date of the incident. He responded he "would have to recollect back to [his] incident report." Defense

4                                                                                    A-3013-19

counsel then inquired if footage from his body cam would refresh his "recollection as to what time [he] showed up at the scene." At that point, the court interjected and asked if there was "any reason why [counsel] would not want to use [the] incident report just for purposes of refreshing [the officer's] recollection as to the time he was there." Because defendant's attorney stated he preferred to use a transcript from the officer's body cam footage to refresh the officer's recollection, it was marked for identification. Officer Camacho acknowledged the transcript showed he arrived at the scene at approximately 6:15 p.m. The officer also testified "I would have to refer to my incident report . . . . I'm not going to say something that I can't exactly . . . do a thing because that would be lying." However, he also conceded he had no reason to doubt the transcript correctly reflected the time he arrived at A.G.-B.'s home. Defense counsel did not seek to admit the transcript into evidence.

During his closing remarks, defense counsel asserted for the first time "the fact that [A.G.-B.'s] correct last name was never identified prejudiced our case. It prejudiced our ability to conduct research into [A.G.-B.]" Counsel also stated the TRO was "fatally defective" because of the inconsistency between A.G.-B.'s correct name and the name on the TRO such that defendant could not "be held liable for it. He was not on proper notice." Finally, the defense urged the court

to take notice of the "glaring discrepancy in the testimony" between A.G.-B. and Officer Camacho regarding the time the officer arrived at her home.

Following the summations of counsel, the trial judge credited the testimony of the State's witnesses and found defendant guilty of contempt. The judge observed that although the defense argued the TRO was "defective" because it did not reflect A.G.-B.'s hyphenated name, a "defective TRO, even a TRO improperly granted, if violated while the TRO is in place, that violation is not in some way obliterated by the alleged defect[]." Significantly, the judge also found defendant "was not here in any way to indicate that he didn't know who the holder of the restraining order was, as clearly the restraining order references their child, who has custody, and the like."

Additionally, the judge concluded defendant came to A.G.-B.'s home "about 1 a.m., I believe this was April 19th," and that because she was "fearful" of defendant, she allowed him to spend between thirty to sixty minutes with Ryan before telling defendant to leave. The judge further found:

> [t]hat restraining order prevented [defendant] from going to her residence. The testimony is on the night late April 18th, early April 19th, he was at her residence, was inside the residence, and damaged property of hers. There was no mistake to this action. There was an indication he was there for a purpose to see his son and so the court would find certainly that it

6

was a knowing violation of the order that he should not be at that residence.

Further, the judge noted A.G.-B.'s testimony "corroborates with Officer Camacho. But for any differences as it relates to time, the stories corroborate." The judge observed that based on "the specificity with which [A.G.-B.] testified as to the event," he "did not feel . . . any of the cross-examination mitigated this court's finding that she was credible in all material respects. So, all of the elements [of contempt] have been proven beyond a reasonable doubt." The judge then issued a warrant for defendant's arrest and stated defendant would be sentenced following his apprehension. On April 7, 2020, the judge sentenced defendant to a six-month jail term.

On appeal, defendant raises the following arguments:

A.   Standard of Review.

B.   Because the Restraining Order Was Entered in Favor of a Name Other than the Purported Victim, Reasonable Doubt Exists as to Whether Defendant "Knowingly" Violated the TRO.

C.   Due to Irreconcilable Differences in Witness Testimony, Reasonable Doubt Exists as to Whether Defendant Violated the Restraining Order.

These arguments are not persuasive.

A-3013-19

A person is guilty of contempt "if that person purposely or knowingly violates any provision in an order entered under the provisions of the Prevention of Domestic Violence Act [(PDVA)]." N.J.S.A. 2C:29-9(b)(2). To establish criminal liability for contempt, the State must prove beyond a reasonable doubt: (1) there was an order entered; (2) defendant knew of the existence of the order; and (3) defendant purposefully or knowingly disobeyed the order. State v. Chenique-Puey, 145 N.J. 334, 341-42 (1996) (citing N.J.S.A. 2C:29-9(b)). "A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence." N.J.S.A. 2C:2-2(b)(2).

Here, it is uncontroverted that roughly two months after defendant was served with the TRO, he went to A.G.-B.'s home, entered her home over her objection, and demanded to see his son. Regardless of when on April 19, 2019 defendant kicked down A.G.-B.'s door to exercise parenting time with Ryan, the mere fact he appeared at her home to exercise this parenting time at all constituted a violation of the TRO. In reaching this conclusion, we agree with the trial judge's determination "[t]here was no mistake to this action." See State v. S.K., 423 N.J. Super. 540, 547 (App. Div. 2012) ("[T]he evidence must allow

at least reasonable inference that a defendant charged with violating a restraining order knew his conduct would bring about a prohibited result."). Because the TRO specifically identified the parties' son by name, barred defendant from having "any oral, written, personal, electronic, or other form of contact or communication" with "the parties' child," and also prohibited defendant from exercising "parenting time/visitation until further ordered," we perceive no reason to second-guess the trial court's finding defendant was guilty of contempt for knowingly violating the TRO.

Regarding defendant's contention he was deprived of the opportunity to conduct discovery to impeach A.G.-B.'s credibility because her fully hyphenated name was not listed on the TRO, we are not convinced. As the judge found, defendant "was not here in any way to indicate that he didn't know who the holder of the restraining order was," and the TRO referenced the "parties' child" by name, and reflected "who has custody, and the like." Also, although defense counsel elicited A.G.-B.'s full name at the start of cross-examination, he did not seek a continuance at that point to pursue further discovery based on A.G.-B.'s use of a hyphenated name. Instead, he waited until summations to assert the failure to include A.G.-B.'s "correct last name" on the TRO prejudiced the defense's "ability to conduct research into [A.G.-B.]" Moreover, to the extent

9

defendant contends he could have used a screenshot of a social media post dated February 19, 2020 to impeach A.G.-B.'s credibility, his argument fails because the screenshot is dated six days after the contempt trial concluded.

In short, we find no basis to upset the judge's finding the State proved beyond a reasonable doubt defendant was guilty of contempt. See Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (Family court's findings are binding on appeal when supported by substantial credible evidence in the record.).

To the extent we have not addressed defendant's remaining arguments, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3013-19